No. 61.—THE STATE OF GEORGIA, *ex rel.* JOHN H. LOW, plaintiff in error, *vs.* GEORGE W. TOWNS, Governor, &c. of the State of Georgia, defendant.

[1.] Where two individuals claim the right to the office of Clerk of the Court of Ordinary, and one of them obtains a commission from the Governor, it is competent for the Judiciary to go behind the commission, and to inquire into the validity of the election, and decide the rights of the contesting parties, notwithstanding the Governor may have issued a commission to one of them, from the evidence before him.

[2.] The issuing a commission by the Governor to such Clerk, is merely a ministerial act, required by law, and not a duty enjoined by the Constitution, and is, therefore, only *prima facie* evidence of title to the office, and not *conclusive.*

[3.] However clear it may be, as a general *legal* proposition, that when a mere *ministerial* act is required to be performed, by law, on the part of an executive officer, and individual rights depend on the performance of that act, that the proper tribunals of the country have jurisdiction to compel its performance; yet, for *political* reasons alone, the Chief Magistrate of the State cannot be compelled, by *mandamus*, to perform such ministerial act.

[4.] When the relator, applying for a *mandamus nisi* against the Governor, to issue to him a commission as Clerk of the Court of Ordinary, had failed to

establish his title to the office, by the judgment of a Court of competent jurisdiction: *Held*, that the Court had no jurisdiction, according to the relator's own showing, to award the *mandamus nisi* against the Governor.

Application for a *mandamus absolute.* Decided by Judge JOHNSON, 22d March, 1850.

This was an application for a *mandamus* to compel the Governor to issue a commission to the relator, John H. Low, as Clerk of the Court of Ordinary of Henry County. The petition for a *mandamus nisi* set forth the following facts :

On the second Monday in January, 1847, John H. Low was elected Clerk of the Court of Ordinary of Henry County, and was duly commissioned and qualified. On the first Monday in January, 1849, Peter Z. Ward and four others were elected Justices of the Inferior Court of Henry County. On the second Monday in January, 1849, before the Justices elect were commissioned and qualified, Columbus W. Smith and two others, being a majority of the Justices of the old Court, re-elected Low Clerk for the next ensuing two years, and transmitted the certificate of his election to the Governor, as required by law. Garry Grice, one of the old Court, without any authority from the Governor, on the same day proceeded to swear in two members of the new Court. After the election of Low—but on the same day—the new Court, without Clerk, Sheriff or record, proceeded to and elected one James Pyron Clerk of the Court of Ordinary for the next two years, and fraudulently transmitted a certificate of his election to the Governor, who soon thereafter issued a commission to James Pyron. At the April Term, 1849, of Henry Superior Court, an information, in the nature of a writ of *quo warranto,* upon the relation of John H. Low, issued against James Pyron, to inquire as to the authority by which he exercised the said office; and after hearing his return thereto, a judgment of *ouster* was granted, removing Pyron from the said office, which judgment was unreversed and unappealed from. After this judgment, Low again applied to the Governor for a commission, who refused to issue a commission to him. In consequence of which refusal, the new Court again appointed Pyron Clerk, which appointment was recognized by the Governor.

The petition farther stated, that the judgment of *ouster* had

been officially communicated to the Governor, and he requested and required to commission Low, which he had refused to do.

On this petition, Judge *Johnson*, on the 18th December, 1849, granted a *mandamus nisi*, requiring the Governor to show cause, on the fourth Monday in February, 1850, why he should not issue a commission to the petitioner.

In response, Gov. *Towns*, " to manifest his respect for the judicial department of the State Government," and " without thereby, in any degree, acknowledging the jurisdiction of the Court over him, as the Executive, by *mandamus*, or waiving by his response, any power or right conferred to him by the people, under the State Constitution," " submitted the following considerations and reasons why the Court should not take farther cognizance of the case made upon the relation of John H. Low :

" 1st. Because, as Governor of the State, deriving his powers from the Constitution thereof, he has been made a co-ordinate, separate, distinct and independent department of the Government ; and as the Executive Magistrate, filling said department, he is not subject, in the discharge of any duty, or the exercise of any power within the range of his department, to the mandate of the Judiciary, but is amenable, alone, for a failure, or omission, or refusal to execute an Act of the Legislature, to the people of Georgia.

" 2d. Because, by no just interpretation of the Constitution of Georgia, can a separate, distinct, co-ordinate and co-equal officer be made a subordinate and ministerial officer ; obliged, under the penalty of contempt, to obey the mandate or order of his co-equal and co-ordinate, in any manner, whatever, concerning his executive duties ; and because, the Judiciary, having no such paramount power by the Constitution over the Executive, it can derive no right from the Legislature, so as to change or alter the distribution of powers and duties, as prescribed in the Constitution."

A third ground was taken in the response, denying that any judicial decision, establishing relator's right had been communicated to respondent, which was waived on the hearing.

The Court refused a *mandamus* absolute, on the ground that a writ of *mandamus* will not lie from the Superior Court against the Governor of the State of Georgia, to compel the performance

of an act which, as Governor, he is required by law to perform, and which he refuses to perform.

To this decision Low, by his counsel, excepted, and alleges the same to be erroneous.

DOYAL & NOLAN and R. V. HARDEMAN, for plaintiff in error, cited—

*Constitution of the State, art.* 3, §7. *Bonner vs. The State ex rel. Pitts,* 7 *Ga. Rep.* 473. *Kendall vs. The United States,* 12 *Peters,* 610.

I. L. HARRIS and A. H. KENAN, for defendant in error.

Points made and authorities cited by IVERSON L. HARRIS, for defendant in error—

The writ of *mandamus will not, in any case, lie to the Executive,* but can be directed only to *heads* of departments, upon whom the Legislature have imposed *ministerial* duties not in conflict with their political duties to the Executive. *Marbury vs. Madison,* 1 *Cranch's Rep.* 137. *Case of Kendall,* 12 *Peters' R.* 610.

The maxim, that for every wrong there is a remedy, cannot, upon proper examination, be found to furnish the fountain of the power claimed. For its just interpretation, see *Broom's Legal Maxims, pp.* 43, 44, 80.

The other maxim, that a private inconvenience must be permitted to go unredressed, rather than a public inconvenience be created by the attempt to furnish a remedy, controls the first. *Broom's Legal Maxims, p.* 77.

That the writ of *mandamus,* in England, is an *executive* and not a judicial writ; though issuing out of the Queen's Bench it always runs in *her name.* 3 *Black. Com.* 110. *Bacon's Abridg. title Mandamus. Ex parte Crane,* 5 *Peters' Reps.* 190.

In Georgia, the power to issue this writ is conferred on the Superior Courts, by the Constitution; yet the *character* of it is not in substance changed, nor has it acquired, by the constitutional delegation, any new force or *larger extent of jurisdiction* than it had in England. It goes in cases where it is necessary to carry out their judicial powers against precisely the same inferior

officers and judicatories embraced within its compulsive range in England. §7, *art. 3, Constitution of Georgia.*

*Mandamus* being an executive writ, would have belonged to the Superior Court, as an incident to its general jurisdiction, without the express grant of it by the Constitution. *Adopting Statute,* 1784, *Prince's Dig.* 570.

A change in the forms of writs, made necessary by the change of our form of Government, is only authorized by our Adopting Statute, so far as to mould them to suit similar departments and offices in this Government. Pursuing the spirit of that Act, and the analogies of law, the *mandamus should always run in the name* of "the Governor of Georgia." *Adopting Statute,* 1784, *Pr.* 570.

*Mandamus* will not lie against the Executive of Georgia. *Hammond vs. Whitaker, decided by Judge Strong, in* 1822. *William B. Johnson vs. Compton, Surveyor General, decided by Judge Merriwether,* 1849.

It will not lie to compel the Governor to issue a commission. 2 *vol. of Supplement to U. S. Digest, p.* 384—*citing Hawkins vs. Governor, Pike's Reps.* 570.

The executive, legislative and judiciary departments of government, declared to be separate, distinct, independent. Co-ordination and equality are fairly implied from that declaration. §1, *art. 1, Constitution of Georgia.*

The distribution of powers, and the limitations and restrictions as to the exercise of others, preclude the idea, that the paramount, supreme power asserted, is consonant with our form of Government. §1, *art. 1, Con. State of Georgia.*

*All* the powers of the Government, consisting of three classes, having been, by the Constitution, apportioned among the departments, it is insisted, that it is not within the competency of the Legislature *to add to or abridge those conferred;* nor can it, by a law imposing any duty, degrade the Executive from the *equality* given him by the Constitution. §1, *art. 1, Cons. Ga. Marbury vs. Madison,* 1 *Cranch,* 137.

The Judges of the Superior Courts having *equal* judicial powers by the Constitution, it follows that one of them cannot be compelled, in a civil suit, to obey any writ issued by another, whether that writ be *mandamus* or *attachment. See* §1, *art. 3, Cons. of Ga.*

Members of the Legislature are exempt from arrest or impri-
sonment, in civil cases, *during the time they are engaged in the
business of legislation.* §14, *art.* 1, *Cons.*

It is a necessary implication from the consideration of the
*functions* of the Executive—the *equality* of rank with the other
departments, and being entitled to the same privileges that they
possess—that the Governor cannot be liable to arrest, imprison-
ment or detention, *while he is in the discharge of the duties of his
office,* and for this purpose his person must be deemed to possess,
at least in civil cases, an *official inviolability.*    3 *Story's Com. on
Constitution,* 419.

*By the Court.*—WARNER, J. delivering the opinion.

This is an application on the part of John H. Low, the relator,
for a *mandamus nisi* against Governor Towns, to show cause why
he should not issue to him a commission as Clerk of the Court of
Ordinary of Henry County.

It appears from the record, that Low, the relator, was elected
Clerk of the Court of Ordinary of Henry County, in January,
1847, for the then ensuing two years; that in January, 1849,
Low, the relator, claims to have been duly re-elected to the office
by the old Court, for two years, and that James Pyron also claim-
ed to have been duly elected to the same office, by the newly
elected Justices of the Inferior Court, in January, 1849, for the
ensuing two years. Both applicants for the office presented
certificates of their election, to the Executive Department, and
demanded a commission. The Governor issued a commission to
Pyron, who was appointed by the new Court, and refused to
commission Low, who was appointed by the old Court. Subse-
quently, a writ of *quo warranto* was filed in the Superior Court
of Henry County against Pyron, and at the April Term of that
Court, in the year 1849, judgment of ouster was rendered against
Pyron, ousting him from the office of Clerk, on the ground *that
he was not elected according to law.* At the October Term, 1849,
of Henry Superior Court, another order was made by that
Court, ordering the books and papers appertaining to the office
of Clerk of the Court of Ordinary, to be turned over to the
Clerk holding a commission issued in 1847; but there is no judg-
ment of any Court, deciding that Low, the relator, was legally

elected to the office of Clerk, in January, 1849. The fact appearing on the face of the record, that the books and papers appertaining to the office were directed, by the judgment of the Superior Court, to be turned over to the Clerk holding a commission issued in 1847, clearly shows, that the validity of Low's election in January, 1849, was not determined by the Superior Court, but remained an *open question.* Such being the facts of the case, in December, 1849, application was made by Low, to the Judge of the Superior Court of the Ocmulgee Circuit, for a *mandamus nisi,* calling upon the Governor to show cause why he should not issue a commission to him, as the duly elected Clerk in January, 1849.

To this *mandamus nisi* the Governor responded, denying the jurisdiction of the Court to issue a *mandamus* against him, but does not admit the right or title of Low to the office which he claims.

[1.] In *Pitts vs. Bonner,* this Court held, that the issuing a commission to the Clerk appointed by the Court of Ordinary, by the Governor, as required by the Act of 1799, was a *ministerial* act, and that it was competent for the judiciary to go behind the commission, and to inquire into the validity of the election of the person so commissioned, at the instance of an individual whose rights might be prejudiced thereby. 7 *Ga. Rep.* 479.

The power of the judiciary to inquire as to the right or title of one, holding and exercising the duties of an office, under a commission from the Governor, has been gravely questioned, as being an unauthorized interference with the duties of the executive department of the government, and those high in authority have been made to feel " an *involuntary shudder,* as if at the near approach of grasping power, the judiciary was about to plant its iron heel upon a prostrate Constitution." With the most profound respect for the executive department of the government, we cannot assent to the proposition, that the mere *ministerial* act of the Governor, issuing a commission to an individual, shall be *conclusive* evidence of his right and title to the office which he claims under it, and that the Courts have no power or authority to look behind the commission, and adjudicate the rights of the parties claiming the office, under the Constitution and laws of the State. In this country, supreme power exists in the people alone, and they have created certain offices for *their own benefit.*

The Clerk of the Court of Ordinary derives his office from the Constitution and *the law*, not from the *prerogative* of the executive department of the government.

[2.] The tenure by which the office is held, does not depend upon the commission which the Governor may think proper to issue; that, it is true, may be *prima facie* evidence of his appointment; but suppose the certificate of appointment furnished the Governor had been forged, and the person commissioned by him had never, in fact, been appointed by the Court of Ordinary as its Clerk? Shall the *ex parte* proceeding of issuing a commission by the Governor, who has no power to summon a Jury to try questions of fact, or command the attendance of witnesses, be held *conclusive* as to the rights of the citizen, claimed under the laws of the land? The validity of the title to an office created by law, is a *judicial* question—one which it is not only the duty of the Courts to decide, but one which, in our judgment, it is the exclusive province of the judiciary department to determine, notwithstanding the Governor may have commissioned one of the claimants. The commissioning Clerks is no part of the duty enjoined by the Constitution on the executive department of the government; nor has the Executive any discretion as to who shall be appointed Clerk of the Court of Ordinary; all that the Governor is required to do, by the Act of 1799, is to *commission* the Clerk who shall be appointed by the Court of Ordinary. By the sixth section of the third article of the Constitution, the powers of a Court of Ordinary, or Register of Probates, are vested in the Inferior Courts of each County in this State, which Inferior Courts have the power to vest the care of the records and other proceedings thereon, in the Clerk or such other person as they may appoint. *Prince*, 911.

By the 1st section of the Act of 1799, the Courts of Ordinary in each county, are authorized to appoint their own Clerks, *who shall be commissioned by the Governor*. *Prince*, 231.

It will be perceived that the Clerk of the Court of Ordinary derives his right to the office, when appointed, not from the executive department of the government, but from the Constitution and the law. Deriving his title to the office from the Constitution and the laws of the people of the State, when appointed in accordance with the law, he acquires a *vested right* to all the benefits arising therefrom, which the laws of his country will pro-

tect. To withhold from the Clerk, when legally appointed, his commission which the law entitles him to receive from the Governor, is not only a *violation of the law*, but of a *vested legal right.* When a contest arises between two individuals respecting that right, although one of the parties may derive his claim thereto, under a commission from the Governor, issued in accordance with his judgment, from the evidence before him, as to which of the contesting parties was legally elected Clerk, the judicial tribunals of the State have the appropriate jurisdiction of the question, and may proceed, according to the course of the Common Law, and finally adjudicate the respective rights of the parties as to who was legally elected and entitled to the commission, under the law. This is a government of *laws* and not of *men*, and the judiciary department of the government is the legitimate and appropriate department to investigate and decide upon the vested rights of individuals, when acquired under the Constitution and laws of the land. If the executive officer of the government has the power and authority to vest the office of the Clerk of the Court of Ordinary in such person as he may choose to *commission*, then he has the power to repeal that part of the Constitution which declares, that "the *Inferior Court shall have power* to vest the care of the records and other proceedings therein, in the Clerk or such other person as *they may appoint.*" The power of appointing a Clerk, is vested, by the Constitution, in the Inferior Court, sitting as a Court of Ordinary, and all the Governor has to do with the appointment, is to *commission* the individual who shall be appointed according to law. The Statute expressly declares, that the individual appointed Clerk by the Court of Ordinary, *shall be commissioned by the Governor.* But it is said, the Clerk legally appointed to the office, may perform the duties of it, without a commission; that the commission is not absolutely necessary for him to enjoy the benefits accruing from the office. As a general rule, this may be true; but we apprehend, according to the peculiar provisions of our Statute of 1809, a commission is necessary, before the party elected Clerk can enter upon the discharge of his official duties. That Act declares, that Clerks of the Courts of Ordinary, (and other officers specified in the Act,) who are in office, shall perform all the duties of their respective offices, during the time intervening between the election and *commissioning* of their successors, with all

the responsibilities to which they were liable previous to said election. *Prince,* 177. This Act clearly contemplates, that the newly elected Clerk shall not enter upon the discharge of his official duties until he is *commissioned.*

The Clerk appointed by the Court of Ordinary, then, is, under the law, entitled to have a commission from the Governor. It is his right to have the commission, under the law, not only as the *evidence* of his appointment, but, as we have shown, it is necessary for him to have it, to enable him to *enter upon the discharge of his official duties.* We have shown that the judicial tribunals of the State have jurisdiction, in a contest between two individuals as to the right to the office of Clerk of the Court of Ordinary, to adjudicate that question, although one of them may derive his title to the office under a commission from the Governor. But suppose the appropriate tribunal had adjudicated the question, that Pyron was not elected to the office according to law, and vacated his commission, and that Low, the relator, was duly and legally elected the Clerk of the Court of Ordinary of Henry County, and that the decision of the Court had been duly certified to the Governor, and he should still refuse to commission him, is Low without any remedy for this acknowledged wrong ? The proper judicial tribunal of his country, has established his right to the office and his right to have the commission to which the law declares he is entitled. This question was partially considered by this Court, in *Bonner vs. Pitts,* and it is difficult to perceive, according to the general principles of the law, why it is that the citizen should have a *right,* and not have a *remedy* to enforce that right ; especially where that right depends on the performance of a mere *ministerial* act, enjoined by the peremptory enactment of the law. " The very essence of civil liberty, (says Chief Justice *Marshall,* in *Marbury vs. Madison,* 1 *Cranch,* 145,) certainly consists in the right of every individual to claim the *protection of the laws,* whenever he receives an injury. One of the first duties of government is to afford *that protection.* In Great Britain, the King himself is sued in the respectful form of a petition, and *he never fails to comply with the judgment of his Court.*"

*Blackstone* states it to be a general and indisputable rule, that where there is a *legal right,* there is also a *legal remedy,* by suit or action at law, whenever *that right is invaded.* 3 *Bl. Com.* 23.

If the Court has jurisdiction to decide the *question of right*, it would seem it ought to have jurisdiction to enforce *that right;* for, as *Blackstone* says, authority to try would be vain and idle, without an authority to redress; and the sentence of a Court would be contemptible, unless that Court had power to command the execution of it. 1 *Bl. Com.* 242.

In *Kendall vs. The United States*, Mr. *Butler*, the Attorney General, admitted in his argument, that if the President of the United States was required, by law, to perform an act merely *ministerial*, and necessary to the completion or enjoyment of the rights of individuals, he should be regarded, *quoad hoc*, not as an *executive*, but as a merely *ministerial* officer, and, therefore, liable to be directed and compelled to the performance of the act by *mandamus*, if Congress saw fit to give the jurisdiction. 12 *Peters*, 595.

In this State, the Judges of the Superior Courts have the power, expressly conferred by the Constitution, to issue writs of *mandamus*, &c. and all other writs which may be necessary for carrying their powers fully into effect. *Prince*, 911.

In *Kendall vs. The United States*, Mr. Justice *Thompson*, in delivering the judgment of the Court, remarks, " That it would be an alarming doctrine, that Congress cannot impose upon any executive officer, any duty they may think proper, which is not repugnant to any rights secured and protected by the Constitution; and in such cases, the duty and responsibility grow out of, and are subject to the control of the law, and not to the direction of the President; and this is emphatically the case where the duty enjoined is of a *mere ministerial* character." 12 *Peters*, 610.

If it is competent for the Legislature to impose on the Governor the performance of a *mere ministerial* duty, to issue commissions to Clerks, appointed by the Court of Ordinary, it is difficult to perceive, upon *legal* principles, why he should not be held responsible for the due execution of that duty, and be regarded, *quoad hoc*, not as an executive, but as merely a *ministerial* officer. The issuing commissions to Clerks, is certainly not one of the duties confided to the executive department of the government, by the Constitution, but is merely a *ministerial* act required by *the law.*

In the case of *Ferguson vs. Earl of Kinnowl*, decided in the House of Lords, the distinction between a *judicial* and a *ministe-*

*rial* act was clearly recognized. In that case, Lord *Broughham,* after denying that the judicial officers of Courts of general jurisdiction, were answerable for acts done within the limits of their jurisdiction, for errors of judgment, however plain the miscarriage may be, and however injurious the consequences, used the following expressive words : " But where the law neither confers judicial power, nor any *discretion* at all, but requires certain things to be done, every body, whatever be its name, and whatever other functions of a judicial or of a discretionary nature it may have, is bound to obey ; and with the exception of the Legislature and its branches, every body is liable for the consequences of disobedience." Lord *Campbell* said, in delivering his judgment in the same case, " Where there is a *ministerial* act to be done by persons who, on other occasions, act judicially, the refusal to do the ministerial act is equally actionable as if no judicial functions were, on any occasion, entrusted to them. There seems no reason why the refusal to do a *ministerial* act by a person who has certain *judicial* functions, should not subject him to an action, in the same manner as he is liable to an action for an act beyond his jurisdiction. The refusal to do the ministerial act, is as little within the scope of his functions as Judge, as the act where his jurisdiction is exceeded. In the act beyond his jurisdiction, he has ceased to be a Judge." The foregoing principles were affirmed by the House of Lords, without a dissenting voice. 9 *Clark & Finn's Rep.* 279.

Now, as to all matters confided to the judgment and discretion of the executive department of the government, by the Constitution—as the appointment to office to fill vacancies, to approve or disapprove bills enacted by the Legislature, and the like—the Courts have no jurisdiction to interfere with the exercise of that judgment or discretion ; but the commissioning Clerks, is not a matter which has been delegated, by the Constitution, to the judgment or discretion of the executive officer of the government. The Legislature have enjoined upon him, by *law,* the performance of the *ministerial* duty to *issue commissions* to such Clerks as *shall be appointed by the Courts of Ordinary,* and the rights of the persons, so appointed, to enter upon the discharge of their official duties, is made to depend upon the performance of this ministerial act. If, as has already been remarked, it was competent for the Legislature to impose this ministerial duty of issuing

a commission to a Clerk, on the executive officer of the government, wholly independent of, and in addition to the other functions devolved upon that officer by the Constitution, why may he not, when the performance of this ministerial act, so required by law, is *essential* to the completion and enjoyment of individual rights, be considered, *quoad hoc,* not as an *executive,* but as a merely *ministerial* officer, and, therefore, liable to be directed and compelled to perform the act by *mandamus ?*

[3.] Viewed as strictly a *legal* question, we cannot offer any satisfactory reason why he should not, according to the general principles of the law ; and it was in this point of view alone, this question was considered by this Court, in *Bonner vs. Pitts*—indeed, no other view of it was presented for our consideration, on the argument of that case.   But while we are unable to give a satisfactory *legal* reason why the remedy sought should be denied to the citizen, yet we are satisfied, that for *political* reasons alone, the remedy by *mandamus* ought not to be enforced against the chief executive officer of the State.   The ultimate effect of this remedy, in case of refusal by the Governor to obey the laws of the land, would be to deprive the people of the State of the head of one of the departments of the government.   This ministerial act, required by *the law,* is to be performed by the same officer who is, by the Constitution, placed at the head of one of the departments of the government, and is required, by the *Constitution,* to perform certain other duties, of which the people may not be deprived.

Whatever right to the office the relator may have, and whatever remedy he may be entitled to by the law, for the enforcement of that right, as a general proposition ; yet, for the *political* reasons just stated, it cannot be enforced against the Chief Magistrate of the State, by *mandamus,* if it shall be withheld from him.   The framers of the Constitution, doubtless, never anticipated that the executive officer of the government, whose sworn duty it is to cause justice to be executed *according to law,* would ever refuse to comply with the law, when authoritatively adjudicated by the proper department of the government.   In England, as we have already seen, when a right is claimed by the subject as against the Crown, the King is sued in the respectful form of a petition, and he never fails to comply with the judgment of his Court.   3 *Bl. Com.* 255.   *Marbury vs. Madison,* 1 *Cond. R.*

*U. S.* 275. In the monarchial government of Great Britain, when the subject appeals to the Courts of Justice for his *legal rights*, as against the Crown, and the judgment is in favor of the subject, and against the right claimed by the Crown, the King does not feel, it would seem, " *an involuntary shudder, as if, at the near approach of grasping power, the judiciary was about to plant its iron heel upon a prostrate Constitution*," but always manifests his *respect* for the laws of his kingdom, by invariably complying with the judgments of his Courts. Such being the established course of the executive department of the government in Great Britain, we cannot, and we will not presume, that the Chief Magistrate of a republican State would, for one moment, hesitate to issue a commission to the relator, when his right and title to the office shall be established by the *judgment of a Court of competent jurisdiction*. To presume that the executive officer of the government would withhold the commission from one who had been judicially declared, by a Court of competent jurisdiction, *legally elected* to the office, would be to say, in the language of this Court, in *Bonner vs. Pitts*, "that such officer was above the laws of the people; that he had the right to exercise *despotic* power, regardless of the laws of the people; and in the language of Chief Justice *Marshall*, at *his discretion*, sport away the vested rights of individuals, secured and protected by the *laws of the land*. This Court will never indulge such a presumption—respect for the laws of the country, and especially respect for a co-ordinate department of the government, utterly forbids the idea, that the vested rights of the citizen will not be entirely protected, according to law, by the chief executive officer of the State.

[4.] But the relator in this case has never had his right to the office adjudicated by any Court, and until he has done so, his right to a commission is not made apparent to the Governor; at least, by such evidence as was indicated by this Court in *Bonner vs. Pitts*. It is true, the question of the relator's *right to the office* was waived on the argument; but such waiver could not give to the Court jurisdiction, when it had none, by the allegations contained in the record. The first step to have been taken by the relator was, to have had his right to the office in question established by the judgment of a Court of competent jurisdiction. This not having been done, the Court had no jurisdic-

tion, according to the view taken of the matter by this Court in *Bonner vs. Pitts.* This Court will not establish the precedent for parties to come before it, even by *consent,* for the purpose of litigating a mere *abstract* question, when there are no *individual rights* involved. Had the relator established his right to the office, by the judgment of the Superior Court, we are bound to presume that the Governor would have issued to him a commission, in accordance with the law, as adjudicated by the proper tribunal—to presume otherwise, would be wanting in respect to that department of the government, whose sworn duty it is to see that the laws of the State are faithfully executed. There has not been any collision between the judicial and executive departments of the government, and there never can be any, so long as each department continues to perform its appropriate duties. The relator not having established his right to the office by the judgment of any Court, the Court below had no jurisdiction, according to the relator's own showing, to award the *mandamus nisi* against the Governor.

Let the judgment of the Court below, therefore, be affirmed.