WOODS *v.* SHELDON *et al.*

---

## WOODS v. SHELDON, Governor, *et al.*

1. Laws 1890, Chap. 84, Sec. 1, requires county canvassing boards to make a single abstract, including votes for members of congress and presidential electors, which must, by Sec. 2, be duly certified by them, and deposited with the county auditor or clerk, who shall immediately make a certified copy thereof, and forward it to the secretary of state, who by Sec. 4 is authorized, if the returns are not received within 20 days after election, to send a messenger for them, and by Sec. 5 is prohibited from opening them except in the presence of the state board of canvassers when they meet to canvass them, as required by Sec. 3, which declares that such board shall, within 30 days after election, open the returns, and "forthwith" determine the number of votes given for each candidate, and that those respectively receiving the highest vote shall be deemed elected. *Held*, that the state board of canvassers are impliedly authorized to adjourn to a day certain, or take a recess from day to day,

for a reasonable time, to enable them to obtain properly authenticated returns, by sending a messenger for them, in place of those which, when opened on their meeting as required, are found to be improperly authenticated.

2. Laws 1890, Chap. 84, Sec. 3, requiring a state board of canvassers of election returns for members of congress and presidential electors to determine the number of votes received by each candidate, and declaring that the candidates respectively receiving the highest vote shall be deemed elected, impliedly requires the board to canvass all the votes cast in every county in the state if duly authenticated returns are obtainable.

3. A demurrer on the ground that a complaint does not state facts sufficient to constitute a cause of action does not raise the question of jurisdiction.

(Opinion filed Dec. 16, 1896.)

Original application by Richard J. Woods against Charles H. Sheldon, governor, and another, for writ of mandamus. Denied.

The facts are stated in the opinion.

*Horner & Stewart* and *C. H. Dillon*, for plaintiff.

When papers are presented as returns to county, district or state canvassers, it becomes the duty of the canvassers to determine on inspection of the papers, whether they are in form and substance legal returns, and also to determine on inspection of the papers and on consideration of their mode of presentation, whether they are authenticated returns. Paine on Elections, § 604; McCrary on Elections, § 227; 6 Am. & Eng. Encyc. of Law, 311; People v. Nordheim, 99 Ill. 561; Peebles v. Commissioners, 82 N. C. 385; High, Ext. Leg. Rem. § 56 *et seq.* "The weight of authority is to the effect that the law requiring returns to be certified to, or signed or attested by the officers making it is mandatory; and that a return not thus authenticated cannot be received in a contest or by the canvassers." 6 Am. & Eng. Enc. of Law, 337; Paine on Elections, §§ 583, 614; McCrary on Elections, 475, *et seq*; Luce v. Mayhew, 13 Gray 83; Simon v. Durham, 10 Oregon 52; People v. Nordham, 99 Ill. 553; Clark v. Board, 126 Mass. 282; County of Lawrence v. Schmanlhansen, 14 N. E. 255; Luce v. Board,

153 Mass. 108; State v. Randall, 35 Ohio St. 64; Moore v. Kissler, 59 Ind. 152; Kessler v. Cameron, 39 Id. 408. It is an elementary principle of law that officers entrusted with the power of canvassing returns and ascertaining votes are purely ministerial officers, and that they have only such powers as are conferred upon them expressly by law. Smith v. Lawrence, 2 S. D. 185; Paine on Elections, § 603, *et seq.* McCrary on Elections, § 229, *et seq.* Canvassers having performed their duties, and the time limited by statute having expired, they become *functi officio.* State v. Buchanan, 2 Minn. 298; Brown v. Hixon, 45 Mo. 340; McCrary on Elections, § 232, *et seq.*; Hadley v. Albany, 88 Am. Dec. 412; Morgan v. Quackenbush, 22 Barb. 72; State v. Doomwirth, 21 Oh. St. 216; People v. Greene, 12 Barb. 217; People v. Board, 29 N. E. 358. See, also, Attorney General v. Barstow, 4 Wis. 790; McDill v. State Canvassers, 36 Wis. 500. Where officers are entrusted by law with the duty of issuing the certificate of election to the person receiving the highest number of votes, the performance of this duty being merely a ministerial act involving the exercise of no judicial function, it is a proper subject of control by the writ of mandamus on their refusal to perform the act. High, Ext. Leg. Rem. §§ 55, 60, 61. The writ will issue against the governor when acting in this capacity. Merrill on Mandamus. § 93.

*T. P. Estes*, for defendants. *U. S. G. Cherry* and *Melvin Grigsby (Thomas H. Null, John F. Hughes* and *W. L. Shunk*, of counsel), for candidates on the People's Party ticket.

No brief filed.

CORSON, P. J. This is an application by the plaintiff, Richard J. Woods, for a peremptory writ of mandamus, directed to Charles H. Sheldon, as governor of the state of South Dakota, and Thomas Thorson, secretary of said state, commanding them to issue to the plaintiff a certificate of election as presidential elector of this state. The case comes before

this court on an order to show cause. The affidavit for the writ contains the usual statements as to the holding of a general election on November 3, 1896, and that the plaintiff was a candidate on the republican ticket for presidential elector; that the said governor and secretary of state, on the 3d day of December, 1896, met at the senate room in the state house at the capital of the state, and proceeded to open and canvass the returns for members of congress and presidential electors, and declared the result of the said canvass, by which it appears that the plaintiff had a plurality of the votes cast at said election for a presidential elector. It is not stated, however, that all the returns from all the counties of the state were canvassed, nor that the canvassers had adjourned. A demurrer was interposed on the part of the governor and secretary of state to the affidavit of the plaintiff, on the ground that it did not state facts sufficient to constitute a cause of action. The specific grounds urged on the argument were that, the governor being the head of a co-ordinate department of the government of the state, this court had no power to control his action in the discharge of his official duties by mandamus; and also that it does not affirmatively appear either that all the returns from the several counties of the state have been canvassed, or that the canvassers have concluded the canvass and adjourned.

As the only ground of the demurrer is that the affidavit does not state facts sufficient to constitute a cause of action, the question of the jurisdiction of this court of the person and subject-matter is not raised, and therefore need not be decided in this proceeding. Comp. Laws, § 4909. It is due the governor, however, to state that he, through his counsel, in open court, expressed a desire that the matter should be disposed of on its merits, and waived all questions as to the jurisdiction of the court. I am of the opinion that the complaint does, in effect, state that the canvass was completed, and the canvassers had adjourned, upon the plaintiff's theory of the effect of the acts of the governor and secretary of state, which is that the can-

vassers having declared the result of the canvass as far as completed, and decided that the returns from the counties of Butte and Lawrence were not such as they were required to canvass, the canvass was concluded. As the decision upon this demurrer was reserved without prejudice, I am of the opinion that it should be overruled.

An answer was filed by the defendants, which is very full and specific, and sets out all the proceedings had by the canvassers. A demurrer was interposed to this answer, on the ground that it does not state facts sufficient to constitute a defense to plaintiff's application for the writ. It appears by the answer that the canvassers canvassed the returns for all the counties of the state except Butte, and unorganized counties attached to Butte, and Lawrence county, and that the canvassers, having found the returns from those counties defective, took a recess from day to day until proper returns could be obtained from those counties; that a messenger had been sent for properly certified returns from those counties; and that, upon their receipt, the canvassers intended to proceed and complete the canvass. Certified copies of the purported returns from those counties are annexed to the answer. From these it appears that in the two purported returns from Butte county, one of that county proper, and one of the unorganized counties attached to that county, there were no certificates of the auditor, of any description, upon the purported copies of the abstracts. The blank for the auditor's certificate was not filled out, signed, or sealed in either case. It also appears that the certificate of the auditor of Lawrence county to the purported returns from that county contained no seal on any part of the purported copy.

It is contended by the learned council for the plaintiff that the canvassers had no authority to take such recess, or to send a messenger for proper returns from those counties, and that, when the canvassers had canvassed the returns they found properly authenticated, the canvass was concluded. The

learned counsel for the candidates upon the People's party ticket insist: First, that the returns from the counties named were sufficient, and that it is still the duty of the said canvassers to canvass the returns from those counties; second, that, if not sufficient, then the canvassers had the power and authority to take a recess from day to day and to send a messenger to those counties for legal returns. The court held the answer sufficient and overruled the demurrer. Thereupon all parties submitted the case for the decision of the court upon the pleadings and papers before the court. A discussion, therefore, of the facts stated in the answer of the defendants, will be all that will be necessary in the decision of this case. The questions presented are important, and require careful consideration.

Sec. 3, Chap. 84, Laws 1890, defining the duties of the said governor and secretary of state in canvassing the returns for members of congress and presidential electors, reads as follows: "Within 30 days after said election, the governor and secretary of state, in the presence of the auditor of the state, the attorney general and one or more judges of the supreme court shall open the returns made to the secretary of state, for members of congress and for electors of president and vice president of the United States, and shall forthwith proceed to ascertain the number of votes given to the different persons for said offices; and the person having the highest number of votes shall be considered duly elected; * * * and to each person duly elected the governor shall give a certificate of election, signed by him, sealed with the great seal, and countersigned by the secretary of state, and shall transmit the said certificates to each person so elected, and shall issue and publish his proclamation declaring the election of such persons." This section is somewhat vague and indefinite, and, in order to fully understand the meaning of the section and the duties imposed upon the governor and secretary of state, it will be necessary to examine other sections of the act. The first section of the act,

after specifying the manner in which the county board of canvassers shall be organized, provides that said board "shall proceed to open the returns from the various voting precincts of the county, and make abstracts of the votes in the following manner: The abstract of the votes cast for governor * * * shall be upon one sheet; the abstract of votes for members of congress and electors of president and vice president of the United States shall be upon one sheet." The second section provides that "each of the aforesaid abstracts of the votes made, as aforesaid, shall be duly signed and certified by the said canvassers, under the seal of said county clerk or auditor, and shall be deposited in the office of said clerk or auditor. It shall be the duty of said clerk or auditor to immediately make a certified copy. * * * He shall also make a certified copy of the said abstract of votes for members of congress and electors of president and vice president of the United States, and shall inclose the same, and direct to the secretary of state and indorse on the envelope * * * the said auditor's or clerk's signature; and shall forward the same to the secretary of state without unnecessary delay." And Sec. 4 provides that "if the returns are not received by the secretary of state, within twenty days after election, he shall send a messenger for them." While Sec. 3 does not specifically provide that the canvass shall be of all the votes from all the counties, such a duty is necessarily implied from the duty imposed upon them to canvass the vote. "What is necessarily implied in a statute is expressed." Gardner v. People, 62 N. Y. 299. It is clearly the duty, therefore, of the governor and secretary of state, to canvass all the votes from all the counties of the state; and until that duty has been performed, if the purported returns are obtainable, there is no authority on the part of those officers to make any declaration of the result of the votes cast at the state election, or to issue certificates of election to any candidate for presidential elector. It is only "to each person duly elected" that the governor is authorized to give the certificate of elec-

tion. And the canvassers can only determine who is "duly elected" after a full canvass of all the votes cast in all the counties of the state, if duly authenticated returns are obtainable.

The canvass not having been completed as required by law and it affirmatively appearing that the returns of some of the counties of the state have not been canvassed, and the governor and secretary of state having taken a recess from day to day until proper and legal returns can be obtained from those counties, the question is presented as to the power of the canvassers to take such a recess, for a reasonable time, in order to obtain proper and legal returns from those counties. They are not, in terms, prohibited from taking such a recess, and their right to so take it, in order to enable them to properly perform the duties imposed upon them by law, it seems to me, is necessarily implied and included in the powers granted. The returns or purported returns are sealed up by the auditor, and in that condition transmitted to the office of secretary of state. By Sec. 5 it is provided that such returns ("said abstracts") shall be kept in the office of the secretary of state, unopened, until the day appointed for opening them, and shall only be opened in the presence of the board. Suppose one of the envelopes when opened contains no certified copy, or any purported copy, of an abstract of the votes cast for the candidates for members of congress or presidential electors, but contains a purported copy of the abstract of county officers of the county or some other equally irrelevant paper; would it be seriously contended that the failure of the county auditor to perform the duty imposed upon him by law could disfranchise the electors of the county, and deprive the officers actually receiving the highest number of votes at the election of their certificates of election? I apprehend not. Such a theory, if sustained, would place it in the power of a county auditor, intentionally, or by accident or mistake, to destroy an election, and enable parties not entitled thereto, to obtain certificates of election.

As we have seen, the envelope purports to contain the election returns, and are sealed by the auditor, and in that

condition transmitted to the office of the secretary of state. When properly indorsed, the secretary of state must presume that the envelopes contain the duly authenticated returns, as he has no authority to open the envelopes, except at the time of the canvass, in presence of the canvassers. He is precluded, therefore, from sending a messenger for them, as provided by Sec. 4, of the act. If, when opened, the envelope contains no duly authenticated copy of the abstract, are the canvassers without power to supply the proper returns? Clearly not. There must, of necessity, be vested in the canvassers the power to obtain a duly authenticated copy of the abstract, in order that they may perform the duties imposed upon them by law, namely, to canvass all the votes, and issue to the parties having the highest number of votes the certificates to which they are entitled. Smith v. Lawrence, 2 S. D. 185, 49 N. W. 7.

I am of the opinion, therefore, that the power of the canvassers of the vote for members of congress and presidential electors, to adjourn to a day certain, or take a recess from day to day, for a reasonable time, to enable them to obtain properly authenticated returns, and to send a messenger for the same, is clearly and necessarily implied from the duty imposed upon them by the statute, and that the canvassers are required to exercise that power whenever necessary to enable them to properly canvass the entire vote of the state. Much stress is laid upon the clause found in Sec. 3, "shall forthwith proceed to ascertain the number of votes given," etc. This direction is evidently based upon the presumption that legal and proper returns, such as it is the duty of the auditors to furnish, have been received by the secretary of state, and are before the canvassers. This provision, like all other statutory provisions, must receive a reasonable construction, so as to prevent it from defeating the will of the people, as expressed by their vote. The expression "forthwith," therefore, used in Sec. 3, means the canvass must be completed within such reasonable time as is required to perform the duty enjoined upon the canvassers,

namely, to canvass all the votes from all the counties of the state, as shown upon the face of the abstract, deposited in the office of the county auditor, so that the results of the county canvass can be obtained within a reasonable time.

I do not deem it necessary, in this case, to decide whether or not the returns or purported copies of the abstracts sent to the office of the secretary of state, from the counties of Butte and Lawrence, were such as the canvassers would have been justified in canvassing. That question will properly arise in another proceeding now pending in this court, in which a writ of mandate is sought to compel the governor and secretary of state to proceed to canvass the returns of those counties now before them; and I do not deem it proper to anticipate or discuss the questions that will arise in that proceeding.

The canvassers of the congressional and presidential returns are entitled to have before them regular and legal returns in making their canvass, and county auditors are required to furnish them with such returns. The duties imposed upon county auditors are so plain and simple that a failure to comply with the requirements of the statute can only result from gross carelessness.

My conclusions are that the governor and secretary of state, as canvassers of the returns for members of congress and presidential electors, not only possessed the power to adjourn until the proper and legal returns could be obtained from the counties named, and to send a messenger for such returns, but that they were fully justified in so doing under the facts disclosed in their answer. The writ must therefore be denied, and it is so ordered.

HANEY, J. I concur with the presiding judge in the conclusion that the demurrer to the application does not raise the question of jurisdiction, and that the demurrer to the answer must be overruled. The importance of the litigation seems to warrant an expression of my individual views. Disregarding

shadows, and looking only to substance, what was the official duty
of defendants with respect to this canvass? It was to ascertain
the number of votes given the different candidates, as shown
by the county abstracts, in the manner provided by law. What
is that manner? They were, within 30 days after the election
in the presence of certain state officers, to open the envelopes
purporting to contain certified copies of such abstracts, and to
proceed forthwith to ascertain therefrom the number of votes
given to the different candidates. Laws 1890, Chap. 84, §§ 2, 3.
When the election closed, the primary evidence of the popular
will was in the ballot boxes. Precinct officers were required to
ascertain the expression of such will, and record such ascer-
tainment upon precinct returns, and deposit such returns in the
proper county office, where they remain the *prima facie* evi-
dence of who was elected. It would be inconvenient to have
these numerous precinct returns transmitted to the secretary
of state. Therefore the law wisely provides that the results
shown thereby shall be abstracted in each county. The ab-
stract is deposited with the county auditor. How are the facts
shown by such abstracts to be ascertained and declared? By
means of certified copies. It would be inconvenient, if not
practically impossible, for the state officers to visit each county
and inspect the original abstracts. It would be absurd to per-
mit them to ascertain their contents from newspaper reports or
hearsay evidence of any character. It would be unwise to have
the original abstracts sent to the capital, as they might be lost
in transmission. Hence the law provides that certified copies
shall be returned. It expressly declares the contents of the ab-
stracts shall be ascertained by means of certified copies. No
other evidence is competent. The canvassers can act only on
the evidence permitted by law. When such evidence is not be-
fore them they have no means of knowing. They do not know
what appears upon the abstracts. What, then, is a certified
copy? Whenever a copy of a writing is certified for the pur-
pose of evidence, it must be under the official seal of the certi-

fying officer, if there be any. Comp. Laws, § 5311. County commissioners are required to procure and keep a seal, which shall be the seal of the county, and the only one used by the county clerk. Id. § 578. The act creating the office of county auditor requires him to carefully do and perform all acts and duties which were then, or may hereafter be, required to be done or performed by the county clerk. Id. § 649. It seems clear to me, from these and other provisions of the statute, that county auditors are custodians of the county seals, and can make certified copies of writings on deposit in their offices only under the seal of which they are custodians, and which they are required to use. It is evident that this construction has been placed upon the various legislative enactments relating to the duties of auditors, from the fact that all the copies of abstracts sent to the secretary, with the exception of those from two counties, were thus certified. While not controlling, the conduct of such officers is entitled to weight, as manifesting the general understanding as to the intent of the law. I am therefore confident that the defendants were justified in disregarding the papers purporting to be certified copies of the abstracts in Lawrence and Butte counties, because they were not certified copies, and there was no evidence before them showing what such abstracts, in fact, contained.

The attention of the court has been called to numerous decisions involving election returns. Most, if not all, of them relate to original precinct returns. It is said that such returns are hastily made, by persons called from the ordinary vocations of life, and that they cannot be expected to always record their conclusions with accuracy and precision. Everyone is aware that the choice of the qualified electors is frequently defeated by the wanton disregard of law or inexcusable carelessness of such officers; but the nature of their duties is such that their returns must necessarily be construed with great liberality. This rule is elementary, and rests on sound reason, but it has no application to the case at bar. This case does not in-

volve the treatment of original returns made by incompetent or negligent officers.     Here we are dealing with copies made by persons chosen to perform the important duties of county auditors.     There is ample time to make, and certify to, such copies.     The law is plain; the duty simple.     It requires an act which must be familiar to every public officer having records or writings in his custody.     Any person of ordinary intelligence can perform it.     There is no excuse for an auditor's failure to do so.     Again, there is an essential difference between the consequences of rejecting precinct returns and that of rejecting certified copies of county abstracts.     In one case the original record is rendered ineffectual, and the vote of the precinct can be ascertained only by recurring to the ballots, which can be done only by the courts in *quo warranto* proceedings or statutory contests; while in the other the only effect is to reject evidence of facts which still exist in the offices of the county auditors.     To illustrate:     An action is pending based upon a public record.     A writing, purporting to be a certified copy of such record is offered in evidence.     It is found to be defective for want of a seal.     The trial court instantly rejects the evidence, with the result that the action is dismissed or the trial postponed until proper evidence can be procured.     The original record is not affected.     But should the original or a duly authenticated copy be offered, and the court conclude that the original is fatally defective, the action itself fails, because the facts upon which it is based do not exist.     When defendants refused to consider the papers purporting to be certified copies, they did not reject the votes as shown by the original abstracts, but merely the evidence of such votes then before them.

Were defendants authorized to adjourn or take a recess from day to day, for the purpose of procuring certified copies from the excepted counties?     As heretofore stated it was their duty to open the envelopes purporting to contain copies of county abstracts, and to proceed forthwith to ascertain the

number of votes given the different candidates.   As forcefully stated by the presiding judge, they were required to ascertain all the votes given in all the counties.   Sec. 4, Chap. 84, Laws 1890, provides that if the returns, meaning a certified copy of the abstract, shall not be received from any county at the secretary's office within 20 days after election, the secretary shall forthwith send a messenger to the county auditor, who is required to furnish such messenger with a certified copy.   "The law never requires impossibilities."   Comp. Laws, § 4718. The secretary cannot know what the envelopes contain until they are opened.   He cannot open them until the canvassers meet.   When opened, those purporting to be from the counties of Lawrence and Butte did not contain certified copies.   None having been received from those counties at the secretary's office within 20 days after the election, or at any time, it was clearly his duty, upon discovering such fact, to send a messenger for them.   Such duty is expressly enjoined by the statute. Could he and the governor delay their labors until such messenger was given a reasonable lime to return?   The question answers itself.   Defendants were to proceed forthwith to ascertain the number of votes as shown by the abstracts. "Forthwith" means as soon as, by reasonable exertion confined to the object, it may be accomplished.   Bouv. Law Dict. 607. The object of the canvass was to ascertain the number of votes in all the counties, as shown by the abstracts.   The means of attaining such object was the procurement and inspection of certified copies from all the counties.   Defendants were bound to act promptly, with all reasonable dispatch, in attaining the object intended.   This is precisely what they did.   I regard their action as not only legal, but in the highest degree commendable.   It establishes a precedent which will tend to insure care on the part of officers, and will not open the way for a consideration of doubtful returns by state canvassers, when no nenecessity for such action is required.   In cases of this character, courts frequently grow eloquent regarding the rights of

the people, and the necessity of giving expression to the popular will. In my judgment, the most reliable expression of such will is to be found in the law as enacted by the legislature, and that courts can best preserve the rights of all by declaring it as thus expressed. Plaintiff's application should be denied.

FULLER, J. (concurring). I am convinced that this proceeding should be dismissed, for the reason that it appears affirmatively upon the face of the application for a peremptory writ of mandamus that the court is without jurisdiction of the subject-matter.

As the founders of the republic rightfully reposed equal confidence in each department of the government, and assigned to each the performance of specific and independent duties, so the framers of our constitution, enlightened by the experience of centuries, divided the powers of government into three separate and distinct departments,—the legislative, executive and judicial—and prescribed the official duties and functions of each. The legislative power is vested in the senate and house of representatives, the executive power in the governor, and the judicial power in the various courts created or authorized by the constitution. This fundamental conception of a republican form of government has pervaded the schoolhouses of the land and the children have been taught to demonstrate that the entire independence of the three departments of state, each from the influence and control of the other, is sbsolutely essential to the cause of civil liberty. A duty exclusively intrusted to or enjoined upon either department involves the performance of an official act by that department alone, and no other department has lawful authority or inherent power to characterize the same as ministerial, or lay its coercive hand thereon. Therefore, for constitutional reasons, and from consideration of sound public policy and of urgent political necessity, the strongest current of judicial authority is clearly opposed to the doctrine that mandamus will lie to compel the governor of a

state to perform an official duty. While cases to the contrary may be found, relating to so-called "ministerial duties," the latest utterances of courts and text writers are to the effect that any assumption of judicial power to direct, control, or coerce, by mandamus, the official conduct of the chief executive of a state, is without color of authority, and a direct encroachment upon the vital principle which separates a government, of which every man is a sovereign, into three great departments, and expressly defines the duties, functions and powers of each.

The authority of the governor to issue officially, and under the great seal of this state, a certificate of election, as *prima facie* evidence of the relator's rights to an office, emanated from the people, and is a matter of universal public concern, which they have expressly committed to the chief executive, to the exclusion of the other two departments of state. In no essential constitutional particular are the official functions of the governor different from the powers conferred upon the president of the United States, and the following dictum of Chief Justice MARSHALL in the case of Marbury v. Madison, 1 Cranch, at page 164, remains to this day unquestioned by any well-considered authority: "By the constitution of the United States, the president is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience. * * * There exists and can exist no power to control that discretion. The subjects are political. They respect the nation, not individual rights; and, being intrusted to the executive, the decision of the executive is conclusive." Judge COOLEY, in opposition to the view that a court has jurisdiction to issue a mandamus to the governor to require the issuance of a certificate, although it materially affected valuable property rights, and the governor appeared as in this case, and expressed a willingness to abide by the court's decision, uses the following language: "It has long been a maxim in this country that the legislature cannot dic-

tate to the courts what their judgments shall be, or set aside or alter such judgments after they have been rendered. If it could, constitutional liberty would cease to exist; and if the legislature could, in like manner, override executive action also, the government would become only a despotism under popular forms. * * * The apportionment of power, authority, and duty to the governor is either made by the people in the constitution, or by the legislature in making laws under it; and the courts, when the apportionment has been made, would be presumptious if they should assume to declare that a particular duty assigned to the governor is not essentially executive, but is of such inferior grade and importance as properly to pertain to some inferior office, and consequently, for the purposes of their jurisdiction, the courts may treat it precisely as if an inferior officer had been required to perform it. To do this would be not only to question the wisdom of the constitution or the law, but also to assert a right to make the governor the passive instrument of the judiciary in executing its mandates within the sphere of his own duties. Were the courts to go so far, they would break away from these checks and balances of government which were meant to be checks of co-operation, and not of antagonism or mastery, and would concentrate in their own hands something, at least, of the power which the people, either directly or by the action of their representatives, decided to intrust to the other departments of the government." Sutherland v. Governor, 29 Mich. 320. Courts cannot control the exercise of executive power, and the proposition is elementary that "jurisdiction over subject-matter must be given by law. It cannot be conferred by consent of parties." Smith v. Myers, 109 Ind. 1, 9 N. E. 692; State v. Dike, 20 Minn. 363 (Gil. 314).

Because the governmental power of issuing a certificate of election might have been intrusted to some other officer renders the act no less a public trust, and the presumption that such function was imposed by the legislature upon the chief executive, because of his superior sense of responsibility, is en-

forced and strengthened by the fact that such a political duty is usually committed to that department of state, and never to the incumbent of the office in his personal capacity. Rice v. Austin, 19 Minn. 103 (Gil. 74); Turnpike Co. v. Brown, 8 Baxt. 490. Thus, it has been held that the judicial department is powerless to entertain an application for a writ of mandamus to compel the governor to call an election or perform any other duty imposed by law. People v. Cullom, 100 Ill. 472; People v. Bissell, 19 Ill. 229. Where the statute provided that a patent should be signed by the governor, the court refused to attempt, by mandamus, to compel the executive to perform that duty. State v. Harvey, 11 Wis. 33. The governor, being the sole judge, not only of what his official duties are, but also of the time when they should be performed, is exempt from coercion by mandamus or other judicial process. Appeal of Hartranft, 85 Pa. St. 433; Mauran v. Smith, 8 R. I. 192. There is no distinction, upon principle, in the character of the act to be performed. It will not change the result because the duty could have been imposed upon a ministerial officer, instead of the chief executive. Turnpike Co. v. Brown, *supra.*

The supreme court of New Jersey holds that there is vested in the judiciary no power to entertain an application for a mandamus to compel the governor to issue a certificate of election, and, in expressing the views of the court, the chief justice says: "The idea seems to be entertained that the duty of the executive becomes ministerial when no discretion is left as to the manner of its performance, and that in such case the court may interfere to compel its performance. If this be the test, it follows that, wherever the executive duty is clear, the judiciary is authorized to interfere, but in all cases of doubt or difficulty or uncertainty the responsibility of acting rests upon the executive alone. In many cases the law allows the executive no discretion. The duty must be performed in strict accordance with the law, but this court has not, therefore, power to order the duty to be performed. All executive duty is re-

quired to be executed by a higher authority than the order of this court, viz. by the mandate of the constitution. The absence of discretionary power cannot change the character of the act, or warrant the interposition of the judiciary.    *    *    * It is obvious that the exercise of the power now invoked will have a direct and immediate tendency to bring the executive and judicial departments of the government into conflict. It cannot alter the principal that in the present case the governor assents to the application. We have Mr. Jefferson's authority for saying that, if the supreme court had granted a mandamus in the case of Marbury v. Madison [1 Cranch 137], he should have regarded it as trenching on his appropriate sphere of duty; that he had instructed Madison not to deliver the commission; and that he was prepared as president of the United States, to maintain his own construction of the constitution, with all the powers of the government, against any control that might be attempted by the judiciary, in effecting what he regarded as the rightful powers of the executive and senate within their peculiar departments. 4 Jeff. Works, pp. 75, 317, 372." State v. Governor, 25 N. J. Law 331. To the same effect see Hawkins v. Governor, 33 Am. Dec. 346; State v. Fletcher, 39 Mo. 388; Hovey v. State (Ind. Sup.) 27 N. E. 175; State v. Towns, 8 Ga. 360; *In re* Dennett, 32 Me. 508; Railroad Co. v. Lowry, 51 Miss. 102. Mr. Spelling, at page 1206 of the second volume of his recent and very excellent treatise on Extraordinary Relief, has collated the cases for and against the view here expressed, and has employed the following language: "While as before stated the views of courts in the various states radically differ, the doctrine denying the right of interference even with respect to duties usually considered as ministerial is supported by the clear weight of authority."

Conscious of these conflicting decisions, and their tendency to engender vexatious, if not dangerous litigation, the legislature of this state has, in my opinion, established a wholesome rule, entirely consistent with the prevailing weight of author-

ity, by the enactment of Sec. 5517 of the Compiled Laws, which is as follows: "The writ of mandamus may be issued by the supreme and district courts, to any inferior tribunal, corporation, board or person, to compel the performance of an act, which the law specially enjoins, as a duty resulting from an office, trust or station; or to compel the admission of a party to the use and enjoyment of a right or office to which he is entitled, and from which he is unlawfully precluded by such inferior tribunal, corporation, board or person." Under the definition given by text writers and employed in most statutes, the writ of mandamus is directed to "some person, corporation, or inferior court," and in this state "to any inferior tribunal, corporation, board or person" when "such inferior tribunal, corporation, board or person" has not complied with the law in the manner and particulars specified in the foregoing provision. Obviously, the executive department of government is neither an "inferior tribunal, corporation, board or person," and the use to which the word "inferior" has been put conveys to my mind a reasonable inference that the legislature intended to exempt from the coercive influence of mandamus the chief executive of this state. The adjective "co-ordinate" whenever and wherever used with reference to the three departments of state, implies equality in rank, importance, independence and dignity; and the word "inferior" when used to characterize a court, officer or person, imports, comparatively speaking, subordinate jurisdiction, lowliness of official position, or feebleness of mind, etc., and can never be extended by construction to include courts of superior jurisdiction, officers of higher rank, or persons of stronger intellectuality. Moreover, and independently of the statute, it seems to me that the better doctrine and safer rule of practice suggests that this court should decline to consider the subject-matter before it, and dismiss the application for the want of jurisdiction to do anything else.